# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
August 8, 2000, Session

## STATE OF TENNESSEE v. BENJAMIN BROWN

**Direct Appeal from the Criminal Court for Shelby County**
**No. 96-13456, 57, Carolyn Wade Blackett, Judge**

---

**No. W1999-00327-CCA-R3-CD - Decided October 24, 2000**

---

Benjamin Brown appeals from his convictions of one count of felony murder committed in the perpetration of aggravated child abuse and one count of aggravated child abuse. An effective sentence of life imprisonment was imposed. On direct appeal, he contends (1) the evidence is insufficient to support his convictions; (2) the lesser offense of criminally negligent homicide should have been instructed; (3) testimony regarding prior bad acts was erroneously admitted; and (4) his convictions violate the constitutional protections against double jeopardy. Following review, the appellant's conviction for aggravated child abuse is vacated and dismissed as violative of the protections against double jeopardy. We affirm the appellant's conviction for felony murder finding the evidence sufficient to support his conviction. Because the appellant's motion for new trial as to felony murder was untimely filed, the remaining issues related to this conviction are waived.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is affirmed in part; vacated and dismissed in part.**

DAVID G. HAYES, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J. and JOHN EVERETT WILLIAMS, J., joined.

Coleman W. Garrett, Memphis, Tennessee, for the appellant, Benjamin Brown.

Paul G. Summers, Attorney General and Reporter, Michael Moore, Solicitor General, Kim R. Helper, Assistant Attorney General, William L. Gibbons, District Attorney General, and Jennifer Nichols, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The appellant, Benjamin Brown, was convicted by a Shelby County jury of one count of felony murder committed in the perpetration of aggravated child abuse and one count of aggravated child abuse. He was subsequently sentenced to life imprisonment for felony murder and twenty-five

years for aggravated child abuse. The sentences were ordered to run concurrently. He now appeals his convictions alleging:

I. The evidence is insufficient to support his conviction for felony murder;

II. The trial court erred by failing to instruct the jury as to the lesser offense of criminally negligent homicide;

III. The trial court erred by permitting prior bad acts of the appellant to be introduced absent a jury out hearing; and

IV. The appellant's convictions for both felony murder committed in the perpetration of aggravated child abuse and aggravated child abuse violate the principles against double jeopardy.

After a review of the record before us, we conclude that constitutional protections against double jeopardy prohibit the multiple convictions and punishments for felony murder committed in the perpetration of aggravated child abuse and aggravated child abuse. As such, the indictment for aggravated child abuse is dismissed, the resulting conviction is reversed, and the accompanying sentence is vacated. Finding no further error on behalf of the trial court requiring reversal, we affirm the appellant's conviction for felony murder.

**Background**

The appellant and Tammy Huff met and started dating in 1992. A few months after they began dating, the couple announced they were getting married. Ms. Huff was pregnant at the time. The couple married on April 26, 1994, at the Hernando, Mississippi, home of Tammy's father, James Riley Banks. On the evening of his daughter's marriage to the appellant, Mr. Banks received a telephone call from an anonymous female, later identified as Adrena McCoy, informing him that the appellant was the father of her children. Mr. Banks disclosed this telephone conversation to his daughter and informed his daughter that her new husband was not welcome in his home. Tammy left her new husband less than twenty-four hours after they were married, subsequently divorcing the appellant.

On September 16, 1994, Ms. Huff gave birth to a daughter, Ashley Denise. The two resided with Ms. Huff's parents at their Hernando residence. In the summer of 1996, Tammy Huff and the appellant reconciled and were remarried on July 12, 1996. In August, the appellant, Huff, and their daughter moved to an apartment in Memphis.

Soon after moving into the apartment, Tammy began "potty training" Ashley. During the time, Tammy recalled that the appellant "would fuss at [Ashley] and tell her that if she didn't get potty-trained he was going to give her a whipping." Although Tammy never saw her husband spank

Ashley, she did hear him threaten to "whip" her for not using the "potty." Tammy admitted that when she confronted the appellant about his threats, he stated that he was not "going to whip her." She further admitted that the appellant would chastize her for physically reprimanding the child.

Ms. Huff testified that she was unhappy in her marriage to the appellant. On September 12, she decided to leave him. She telephoned her parents and told her father that she wanted to come home. Mr. Banks informed Tammy that "if she was going to come [home] that she was going to stay." After Tammy made this telephone call, the appellant confronted her with his disbelief that she was actually going to leave him. She explained that the appellant became angry and "he like started choking me." The appellant relinquished his hold and again began asking Tammy why she was leaving him. She responded, "Because you're mean and I don't trust you." "[The appellant's] eyes like turned red, and . . . he started coming after me. . . ." He placed a knife to her throat and warned her, "If you leave me, you know, I can, you know, I can kill you. I don't have anything to lose." He then forced Tammy to telephone her parents and tell them that she was not going home.

Ms. Huff testified that the following morning she took Ashley to daycare. The appellant got off work at 12:30 and he picked Ashley up from the daycare center. Tammy did not see Ashley again until 6:30 that evening when the appellant brought Ashley by Tammy's place of employment. Tammy was eating her dinner at this time. Ashley sat on Tammy's lap and ate some chicken nuggets and a brownie. Ashley appeared healthy at this time. Shortly thereafter, the appellant and Ashley left and Tammy returned to work.

At approximately 8:00 p.m., Rita Griffin, a neighbor of the Browns, returned to her residence at the Woodlake apartment complex in Memphis. As she reached the top of the stairs leading to her apartment, she saw the appellant coming out of his apartment. The appellant was carrying his two-year-old daughter, Ashley. The child "was laying on his shoulder . . . it seemed like she was asleep." Ms. Griffin entered her apartment and made a telephone call. Within two minutes, she heard "beating" at her door and asked who was there. The appellant identified himself and exclaimed that "[his] baby fell down the stairs." Ms. Griffin let the "very upset" appellant inside her apartment. The appellant told her that he had sat the child on the steps while he returned to his apartment to get his keys. When he came back outside, he saw that Ashley was on the ground; "she had fallen down the steps."[1] Ms. Griffin then telephoned for medical assistance. Meanwhile, the appellant sat down in a chair and began rocking the child, saying "Ashley, Ashley, wake up." Ms. Griffin observed that the child was gasping for breath and was trying to open her eyes. The appellant was shaking the child in an attempt to revive her. The 911 operator obviously overheard the comments and advised Ms. Griffin to tell the appellant not to shake the child. The appellant then attempted to give the child CPR. During this time, Ms. Griffin was unable to observe whether the child had any bruises, cuts or abrasions on her legs, arms or face.

---

[1] The stairs outside the apartment were made of metal and exposed aggregate concrete surface.

At 8:30 p.m., Tammy received a telephone call from the appellant. He informed her that Ashley had fallen down the stairs. Tammy could hear an ambulance in the background. The appellant drove to Tammy's place of employment and the two proceeded to LeBonheur Hospital. On the way to the hospital, the appellant told Tammy that he forgot his keys and he sat Ashley on the steps. When he came back outside, Ashley was at the bottom of the steps. She stated that the appellant, despite emphasizing that Ashley's condition was serious, was not crying. The appellant attempted to console his wife, telling her that Ashley was going to be fine.

Dr. Jeffrey Eugene Schmidt, a pediatric intensive care physician, testified that he was on duty when twenty-four month old Ashley Brown was brought to the hospital. Ashley was transferred to ICU from the emergency room at approximately 2:00 a.m. The reports from the ER indicated that the patient had "severe neurologic injury." Upon admission to ICU, it was determined that Ashley had "severe neurologic devastation, severe brain injury."[2] "From direct observation, there was no evidence of any external trauma. No scratches, bruises, bumps, no swelling, no cuts." A CAT scan did not show any signs of severe bleeding. However, the attending physicians observed retinal hemorrhages that were classified as "fairly severe." Dr. Schmidt testified that based on the presence/absence of injuries, he determined that the injury was what is known as "acceleration-deceleration syndrome." Specifically, he explained:

> The brain sits in a fluid filled sac called the dura. And especially in little children and babies, the ability for the brain to move within that sac is far more than adults. In fact, in adults it doesn't move much at all. In babies it can move enough that the connections between the brain and the dura, the tiny blood vessels can get sheared. The other – the nerve fibers, too, and the nerve cells can get sheared if there's a sudden impact or acceleration-deceleration force. And then that's also the same explanation for the tiny vessels in the back of the eye. Because of a sudden acceleration-deceleration force, these tiny vessels get ruptured and cause the bleeding, the hemorrhages in the back of the eye.

Dr. Schmidt advised that "acceleration-deceleration syndrome" was commonly recognized as "shaken baby syndrome." The only other explanations consistent with these injuries would be from "major trauma like high-speed motor vehicle accidents, falls from extreme heights," but not falling down a flight of stairs. The "shaking" involved in "shaken baby syndrome" would have to be "extreme, severe, out of control," "shaking back and forth violently," "it requires the head to be snapped back and forth."

Dr. Schmidt testified that the appellant had informed him that Ashley had fallen down the stairs outside their apartment. Dr. Schmidt was suspicious of this statement because it did not comport with the degree of injury received by the child and the injuries to the child were inconsistent

---

[2]Dr. Schmidt explained that the degree of brain injury is measured by the "glasgow coma score." The score ranges from 3 to 15. A normal person will have a score of 15. When Ashley arrived at the ICU, "her score was four. . . . and three is basically no brain function."

with an accidental injury. He explained that if a two-year-old child fell down thirteen or fourteen raised concrete and metal stairs, he would expect to find:

> some external evidence of either cuts, abrasions, bruises. If there was neurologic injury, then I would expect that . . . her head would have had to have hit something and there would be either bruising, bleeding, cuts, abrasions, something that would show that her head struck . . . the step or . . . some evidence of external trauma.

No evidence of external trauma was present on the victim's person. Dr. Schmidt opined that "[t]he only way that a child could have brain damage as severe as [the victim], . . . is the shaking that would cause the severe damage to the brain cells." In support of his conclusion, he stated that the brain injury was inconsistent with the mechanism of a fall down the stairs and there was the presence of retinal hemorrhages which you would definitely not see from a fall down the stairs. The victim died on September 15, at 11:55 p.m. Her death was due to both heart and lung failure.

Dr. Schmidt testified that his concern over the appellant's explanation of the victim's injuries led him to speak with Tammy Huff's mother and sister. Both women expressed concern for Tammy's safety. When confronted by the evidence from the autopsy of bruising to the victim's buttocks and lower back, Dr. Schmidt refused to change his opinion, concluding that a fall would not have produced a "pattern" bruise. Instead, Dr. Schmidt concluded that a pattern bruise to the victim's buttocks would confirm his conclusion of abuse.

Dr. Wendy Gunther, an assistant medical examiner for Shelby County, performed the autopsy on the victim. Her examination revealed "some bruising on [the victim's] left arm and on her buttocks," however, she observed "no abrasions, no lacerations." Dr. Gunther concluded that the bruising on the buttocks was "consistent with somebody having struck her repeatedly. . . ." Dr. Gunther explained that this bruising was difficult to see with the naked eye for several reasons. "One is that bruises in children with dark brown skin are often hard to see, and the other reasons were because of livermotis. When the dead person is lying face up, the blood collects in their back, so everything looks kind of dark red." The bruise measured an area of 5 X 5 inches. This bruising was determined to be "fairly fresh. It had not been a long time before she was injured or died that this happened." Dr. Gunther admitted that the bruises could have been caused "by a very unusual fall." Based upon the post-mortem examination, Dr. Gunther concluded:

> I think Ashley Brown died of shaken baby syndrome. When you take a child . . . and you shake them really, really, really hard, you can scramble the neurons. The axons break apart and the neurons die. . . . There is no other injury which can explain why she went into a coma and never came out . . . [w]hy all the neurons in her brain either died or were starting to die other than shaken baby.

In refuting the appellant's explanation that the child fell down the stairs, Dr. Gunther continued:

If this child fell down a flight of concrete steps, she didn't sustain any injury. There's no skull fracture, there's no major bleeding next to the brain, there's no fractures of her arms or legs or her collarbones or ribs. There's no bruising to show where she might have hit the steps. The only bruising is that bruise on her arm and the bruising on her buttocks. I don't understand how she could have fallen down a flight of 16 steps without sustaining any injury. . . . [T]he only thing she can have died of is shaken baby syndrome, for she has no injury to her brain except the injury of shaking.

In his defense, the appellant presented the testimony of Adrena McCoy. McCoy testified that the appellant is the father of four of her five children. She stated that she and the appellant shared a home together in Greenville, Mississippi, from May 1994 to May 1996. They also lived together prior to this period. While the couple lived together, the appellant was responsible for the care of the children while McCoy was at work. McCoy also testified that she never saw the appellant physically reprimand any of the children and he cautioned her never to "hit them." In essence, McCoy was of the opinion that the appellant was an excellent father and that he could never have harmed a child.

Arusher Sturdevant, the appellant's cousin, testified that, on September 13, 1996, he was at his brother's house between 2:00 and 3:00 p.m. playing dominoes. The appellant arrived at the residence. He had Ashley with him. At first, the appellant tended to Ashley, but when a neighbor's child came over and started playing with Ashley, the appellant joined the domino game. Two hours later the appellant and Ashley left. Roosevelt Robinson, another of the appellant's cousins, confirmed that the appellant had been at his house playing dominoes on September 13.

The thirty-two-year-old appellant testified that he has ten or eleven children.[3] He stated that he met Tammy Huff at Delta State University in November 1993. They married in April 1994 and divorced soon thereafter. Tammy was pregnant at the time of their marriage. The appellant did not see Tammy again until May 1996 when he saw her at his mother's house in Greenville, Mississippi. This was the first time that the appellant saw his daughter, Ashley. During this meeting, the appellant and Tammy decided to "try to give it another try" even though the appellant had been living with Adrena McCoy. In early August, the appellant, Tammy and Ashley moved to Memphis.

The appellant recalled that, on the evening of September 12, Tammy was disgruntled with him because he was late picking her up from work and accused him of being with another woman. An argument ensued and Tammy threatened to leave him. Tammy telephoned her mother and told her she was coming home. She then proceeded to the door when the appellant grabbed her and told her to sit down. Tammy sat down and the couple talked. "Everything was normal after that."

The following day the couple took Ashley to daycare and then each left for their respective jobs. At lunchtime, Tammy delivered the car to the appellant since he got off work before she did. The appellant got off work at 2:30 p.m. and went home. The appellant changed clothes and then

---

[3]The appellant explained that he was not sure whether one child was actually his.

picked Ashley up at daycare. He then went to his 4:30 appointment with his insurance company. After the meeting, the appellant and Ashley went to the home of the appellant's cousin. Shortly after 5:00 p.m., he took Ashley to McDonald's where she got some chicken nuggets. Between 5:30 and 6:00 p.m., he drove to Tammy's place of employment. Tammy came out to the car and they discussed repairing their automobile. She stayed in the car for about thirty minutes, during which time she played with Ashley and fed her something to eat. The appellant then went to his cousin's house where he visited for a while and then returned home. Following this testimony, the appellant reiterated his version of the circumstances leading to the death of Ashley Denise Brown.

Based upon this proof, the jury found the appellant guilty of felony murder committed in perpetration of aggravated child abuse and aggravated child abuse.

## Analysis

As a preliminary matter, the State contends that the majority of the issues, with respect to the appellant's conviction for felony murder, raised by the appellant on appeal have been waived due to the appellant's failure to timely file his motion for new trial.[4] <u>See</u> Tenn. R. App. P. 3(e); <u>State v. Nesbit</u>, 978 S.W.2d 872, 880 (Tenn. 1998), <u>cert. denied</u>, 526 U.S. 1052, 119 S.Ct. 1359 (1999); <u>State v. Johnson</u>, 980 S.W.2d 414, 418 (Tenn. Crim. App. 1998). Accordingly, the State argues that review should only extend to the review of the sufficiency of the evidence and sentencing, as well as plain errors affecting the appellant's substantial rights. <u>See</u> Tenn. R. App. P. 3(e); Tenn. R. App. P. 13(b); Tenn. R. Crim. P. 52(b).

The judgment of conviction for the offense of felony murder was entered by the trial court on April 30, 1999, and the motion for new trial was not filed until June 14, 1999. Rule 33(b), Tenn. R. Crim. P., provides that the written motion for new trial shall be made "within thirty days of the date the order of sentence is entered." The thirty-day period may not be enlarged. <u>See</u> Tenn. R. Crim. P. 45(b). The thirty-day provision is jurisdictional, and an untimely motion is a nullity. <u>See</u> <u>Johnson</u>, 980 S.W.2d at 418 (citing <u>State v. Martin</u>, 940 S.W.2d 567, 569 (Tenn. 1997)). This court does not have the authority to waive the untimely filing of a motion for new trial. <u>See</u> Tenn. R. App. P. 4(a). We are, therefore, without jurisdiction to review the assigned issues stemming from the appellant's felony murder conviction with the exception of a sufficiency review of the evidence. <u>See</u> <u>Johnson</u>, 980 S.W.2d at 418 (citation omitted).

## I. Double Jeopardy

The appellant contends that his convictions for both felony murder committed in the perpetration of aggravated child abuse and aggravated child abuse violate the principles against

---

[4]The judgment of conviction for the offense of aggravated child abuse was entered on May 26, 1999; thus, the June 14, 1999, motion for new trial was timely filed. <u>See generally</u> Tenn. R. Crim. P. 33(b).

double jeopardy. Specifically, he argues that the circumstances leading to both convictions arose out of a single incident and from a single course of conduct, the shaking of Ashley Brown.

The general rule is that a defendant can constitutionally be tried and convicted for first degree felony murder and the underlying felony in a single trial without violating the constitutional prohibitions against double jeopardy. State v. Blackburn, 694 S.W.2d 934, 936-937 (Tenn. 1985). Indeed, there is no double jeopardy violation requiring dismissal or merger where "the two statutes are directed to separate evils." Blackburn, 694 S.W.2d at 936 (citing Albernaz v. United States, 450 U.S. 333, 343, 101 S.Ct. 1137 (1981)); see also State v. Denton, 938 S.W.2d 373, 377 n.11 (Tenn. 1996); State v. Lewis, 919 S.W.2d 62, 69 (Tenn. Crim. App. 1995). The key issue is "whether the legislature intended cumulative punishment." Blackburn, 694 S.W.2d at 936.

With consideration of these principles, a panel of this court recently distinguished convictions for felony murder and aggravated child abuse from the general rule permitting convictions for both felony murder and the underlying felony. See State v. Bobby G. Godsey, No. E1997-00207-CCA-R3-DD (Tenn. Crim. App. at Knoxville, Sept. 18, 2000). Judge Wade, writing on behalf of this court, recognized that "[t]he evil addressed by the legislation at issue is the aggravated abuse or neglect of a child." State v. Bobby G. Godsey, No. E1997-00207-CCA-R3-DD. Additionally, "[t]he legislative history of the . . . first degree murder statute suggests that the objective was to increase the degree of the penalty, not to implement an additional penalty." Id. This court, in a well-reasoned and thorough analysis, continued to hold that

> [a]ggravated child abuse or neglect is unique among the felonies capable of supporting a felony murder conviction because it may be, as indicated in [State v. Jennie Bain Ducker, No. M1997-00074-SC-R11-CD (Tenn. Jul. 14, 2000], a lesser included offense of homicide. Because the legislature did not clearly intend a cumulative punishment for aggravated child abuse where there is a conviction and punishment for first degree felony murder arising out of the same aggravated child abuse, the defendant's conviction for the former must be set aside.

State v. Bobby G. Godsey, No. E1997-00207-CCA-R3-DD. Indeed, the court's reasoning in State v. Bobby G. Godsey relies upon principles of law relating to multiple punishments arising from the same physical conduct within a single criminal episode.

The issue of multiple punishments arising from a single criminal episode was addressed by our supreme court in State v. Phillips, 924 S.W.2d 662 (Tenn. 1996). To determine whether offenses are multiplicitous, several general principles must be considered:

> 1. A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;
>
> 2. If each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous; and

-8-

3. Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.

Id. at 665. These factors must be considered in determining whether the multiple convictions violate double jeopardy.

In the present case, the appellant was convicted of felony murder committed in the perpetration of aggravated child abuse and the underlying offense of aggravated child abuse. The record indicates that the same proof established both offenses; *i.e.*, the same physical acts supporting the appellant's conviction for aggravated child abuse are the same acts supporting his conviction for felony murder. Moreover, neither offense required proof of a fact not required in proving the other. Under principles of double jeopardy relating to multiple convictions, only one offense was committed and only one conviction may stand. Accordingly, the appellant's conviction for aggravated child abuse is vacated.

## II. Sufficiency of the Evidence

In his first issue, the appellant asserts that there is no competent proof in the record to support both his dual convictions for felony murder committed in the perpetration of aggravated child abuse and aggravated child abuse. While he notes that circumstantial evidence alone is sufficient to support a conviction, he argues that the circumstantial evidence in this case is not so strong and cogent as to exclude every other reasonable hypothesis except his guilt. Specifically, he contends that the jury's conclusion that the appellant shook the baby to death "defies logic, reason and common experience." In support of his contentions, he avers that he has no history of child neglect or abuse. Indeed, the proof indicates that not only was he not abusive, but that he was overly protective of his children. Furthermore, he contends that the proof is consistent with his explanation as to the cause of the victim's injuries. Specifically, he submits that "it is possible, and more than likely, that the child fell . . . [f]rom the top of stairwell floor directly to the bottom, landing on her buttocks on the bottom step." This is supported by the bruising to the victim's buttocks. Additionally, he admits that "when he saw his child lying at the bottom . . . of the concrete stairwell. . . . [h]e rushed to her aid and shook her in an attempt to revive her." He admits that "[h]e obviously could have shaken the baby violently enough to cause additional injuries." However, he asserts that injuring the child under these circumstances would not constitute aggravated child abuse. The State responds (1) the appellant's theory that the victim fell directly to the bottom of the stairwell is a physical impossibility; (2) certain facts in the appellant's explanation of the incident were inconsistent; and (3) no prior history of abuse is required before conviction of these crimes.

Tennessee Rules of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

In addition, because conviction by a trier of fact removes the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient.  See  State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

When a criminal offense is established exclusively by circumstantial evidence, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant."  State v. Crawford, 470 S.W.2d 610 (Tenn. 1971); State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995).  In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt. Crawford, 470 S.W.2d at 613; State v. McAfee, 737 S.W.2d 304, 305 (Tenn. Crim. App. 1987).

In its review of the evidence, an appellate court must afford the State the "strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom."  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982) (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)).  The court may not "reweigh or reevaluate the evidence" in the record below.  Evans, 838 S.W.2d at 191; see also  State v. Mann, 959 S.W.2d 503, 518 (Tenn. 1997) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)(weight and inferences from circumstantial evidence are jury questions)).  Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or the trial court judgment.  Tuggle, 639 S.W.2d at 914.

The appellant stands convicted of felony murder committed in the perpetration of aggravated child abuse.  At the time of the victim's death, the crime was defined as

A killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse. . . .

Tenn. Code Ann. § 39-13-202(a)(2) (1996 Supp.).  Aggravated child abuse occurs when a person

. . . knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury . . . [and]

. . .[t]he act of abuse results in serious bodily injury to the child.

See  Tenn. Code Ann. §§ 39-15-401(a) (1996 Supp.); Tenn. Code Ann. § 39-15-402(a)(1) (1996 Supp.).

In the present case, the medical testimony was undisputed that the child died as a result of "shaken baby syndrome."  The appellant was the sole caretaker of the child during the time period when the fatal injuries were inflicted.  The proof also established that the victim had bruising on her buttocks consistent with a spanking or firm beating.  Again, the jury is the sole arbiter of the credibility of the witnesses and conflicts in the testimony.  Thus, we do not disturb the jury's findings

as to these issues. Moreover, contrary to the appellant's assertion, the lack of a prior history of abuse does not preclude conviction for this offense. <u>See, e.g.</u>, <u>State v. Antonio Demonte Lyons</u>, No. M1999-002490CCA0R3CD (Tenn. Crim. App. at Nashville, Feb. 25, 2000) (requirement of prolonged abuse for conviction of aggravated child abuse is not the law). Thus, giving deference to the jury's resolution of the issues of credibility, we conclude that the evidence presented, even though circumstantial, is sufficient to exclude every other reasonable hypothesis save the guilt of the appellant.

Furthermore, the evidence presented belies the appellant's theory of the case. The victim exhibited no scrapes or abrasions which would have been consistent with a fall down fourteen exposed aggregate concrete stairs. Nor did the victim sustain any exterior injuries, including skull fractures, to her head. For the fall to have occurred as the appellant suggests, the two-year-old victim had to have propelled herself over the railing. Obviously, the jury rejected this theory. This issue is without merit.

### Conclusion

After review of the record and the applicable law, we conclude that the appellant's convictions for aggravated child abuse and felony murder committed in the perpetration of aggravated child abuse violate constitutional protections against double jeopardy. The judgment of conviction and sentence upon the charge of aggravated child abuse is, therefore, vacated and dismissed. With regard to his conviction for felony murder, the appellant has not shown his entitlement to appellate relief. Accordingly, the judgment of conviction entered by the trial court for this offense is affirmed.

_____
DAVID G. HAYES, JUDGE